In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3222

Patricia Peele,

Plaintiff-Appellant,

v.

Country Mutual Insurance Co.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 638--James B. Zagel, Judge.

Argued January 18, 2002--Decided April 30, 2002


   Before Manion, Rovner, and Evans, Circuit
Judges.

   Manion, Circuit Judge.  Patricia Peele
sued her former employer, Country Mutual
Insurance Company, alleging that the
company violated Title VII and the ADEA
by discriminating against her on the
basis of sex and age. Country Mutual
moved for summary judgment, and the
district court granted the company's
motion. In doing so, the district court
assumed Peele established prima facie
cases of sex and age discrimination, but
concluded she had not demonstrated that
the company's proffered reason for her
termination, i.e., poor job performance,
was pretextual. Peele appeals the
decision, and we affirm.

I.

   On March 20, 1989, Patricia Peele (then
age 48) was hired by Country Mutual
Insurance Company as a claims support
representative ("CSR") for the company's
Grayslake, Illinois office. As a CSR,
Peele was responsible for processing,
assigning, tracking, and maintaining
claims files. She was also occasionally
assigned single vehicle accident files to
resolve. In April 1990, she received her
first annual performance review. Peele's
supervisor, Dennis Bates, rated her
performance as "competent."[1] In his

written evaluation, Bates noted that Peele "handles all processing + a large amount of claims + answers the phone. She gets along well with others and is dependable." She also received favorable annual reviews (i.e., "competent" ratings) in 1991 and 1992.

In 1993, Country Mutual changed the format of its annual review process. Under the new system, the rankings on the evaluation form were (in descending order): "Exceeds Requirements 2," "Exceeds Requirements 1," "Meets Requirements 3," "Meets Requirements 2," "Meets Requirements 1," "Needs Improvement 2," and "Needs Improvement 1." Peele received a "Meets Requirements 3" rating for her annual review in 1993./2 In his written evaluation, Bates noted that "Pat is always very pleasant with everyone. She stays in the office and does her work. Seldom wastes time. She has gotten better at using audits but still has a ways to go. Her files are always well documented and easy to follow . . . ." After receiving another "Meets Requirements 3" rating in 1994, Country Mutual promoted Peele (then age 54) to a class one claims representative ("CR1"). As a CR1, Peele was charged with handling single vehicle claims. In 1995, at her new position, she received the same "Meets Requirements 3" rating.

In 1996, Peele's rating dropped to "Meets Requirements 2." In his written evaluation, Bates noted that "Pat is very dependable and always willing to help when asked. She handles all single vehicle accidents and deer losses for the most part. She gets along well with her co-workers and has no problems with the insureds." He did, however, criticize Peele's lack of aggressiveness and her slowness in working through claims, and indicated that she needed to work on her "bring-ups." A modernized bring-up system was instituted by Country Mutual in 1994 as one component of a "Model Office" system. The Model Office system included "Best Practices," a set of guidelines for contacting insureds, obtaining appraisals, collecting statements, and bringing claims files to a conclusion./3 The bring-up system is a computerized tickler system that tracks the timely handling of claims according to the Best Practices guidelines. Country Mutual required each of its claims

representatives to be current in their bring-ups for the claims files they handled. The company's claims supervisors are authorized to, and regularly access, each claims representative's bring-ups to monitor their compliance with Best Practices.

In January 1997, in spite of the recent drop in her performance rating, Peele (then age 56) was promoted to claims representative II-Field ("CR2")./4 As a CR2, she was assigned more complex casualty claims involving comparative negligence, multi-vehicle claims and/or property claims, along with field work for accident site investigations and witness interviews. On March 18, 1997, after only a few months on the job, Peele received an "annual" review of her performance as a CR2. Bates gave her a "Meets Requirements 1" rating, the company's lowest level of satisfactory job performance. In his written evaluation, Bates noted that while Peele was "dependable and always willing to help when asked," she still needed to be more "aggressive" and make sure that her files were properly documented./5 Bates also indicated that he had discussed with Peele "her shortcomings since her move to the field [the CR2 position]," advised her that "[h]er complaints on the Claims surveys is one of the highest in the office," and informed her that she needed "to work on getting this turned around."

In September 1997, Gary Hanenberger (then age 40) replaced Bates as the claims supervisor for the Grayslake, Illinois office. Prior to his arrival at the Grayslake office, Hanenberger had been the claims supervisor at the company's office in Rolling Meadows, Illinois. Both before and after his transfer, Hanenberger actively reviewed his claims representatives' on-line activities logs (i.e., computerized calenders and to-do lists used to chart the progress of pending claims) to monitor their compliance with Best Practices. He generally conducted these reviews on-line through each claims representative's activity log. Hanenberger also maintained a practice of conducting quarterly performance reviews of the claims representatives under his supervision, in addition to their annual performance reviews. On December 5, 1997, Hanenberger conducted his first quarterly

review of Peele. In his written evaluation, he noted "[i]n reviewing Pat's files the last three months, I still feel that she needs to work on keeping the insured informed so there [are] no questions [left unanswered]." He also informed Peele that she needed "to work on customer service results," "complete file investigation in a timely manner," and "meet all Best Practices."

On February 18, 1998, Country Mutual performed a "supervisor audit" of all the claims files in the Grayslake office./6 Michael Kearns, one of the company's district managers, oversaw the audit. As a follow-up to the audit, Donald Weber, a district training coordinator, reviewed several of the files at the Grayslake office (including some of Peele's), and prepared an evaluation for each claims representative. In his evaluation of Peele, Weber made the following observations about her files: "[lacked] conclusion letters to the insured," "[lacked] proper investigation," "[m]ost all need more in terms of statements and follow-up investigation," "[c]omparative seems to be a big problem," "[m]any files did not have OALs [i.e., on-line activity logs] in file after closing, and those that did often lacked proper documentation," and "use of a dedicated bring-up system is mandatory in all files." He also advised Peele that her "[o]verall investigations need[ed] to be more timely, thorough and meaningful," that the "[d]ocumentation in [her] file[s] must back up and justify the decisions made based on that investigation," and that she needed to be "more aggressive [in] follow-up and MUST use [the] active bring-up system."

On March 10, 1998, Hanenberger conducted his first annual review of Peele. He assigned her a "Needs Improvement 2" rating, indicating that she was no longer meeting the expectations of her position. In his written evaluation, Hanenberger noted "Pat needs to improve in several area's [sic] to meet the requirements of her position." He also informed Peele that she was required to meet the Best Practices guidelines, conduct proper and timely investigations, apply comparative negligence, keep the customer informed, and keep her files on the bring-up system updated. Hanenberger concluded the evaluation by advising that he would

conduct a "follow-up file review" at the end of the month, and noting "I'm confident that Pat will work hard to improve on these area's [sic] and meet her objectives for the coming year."

On March 25, 1998, Hanenberger conducted the follow-up evaluation of Peele's files, and once again documented numerous performance deficiencies, noting "[w]e have discussed your performance several times in the past 7 months and I still do not see a marked improvement in your job performance. Although, after we talk it seems to improve for awhile, then your performance tends to drop back below an acceptable level." He then outlined five specific problem areas: (1) investigation; (2) keeping the customer informed; (3) use of the bring-up system; (4) application of comparative negligence; and (5) customer survey results. Hanenberger informed Peele that he would "review her files for the next 30 days," and advised that her "failure to comply with correcting [these] performance problems . . . could result in termination of employment."

On May 5, 1998, Hanenberger issued yet another memorandum documenting Peele's job performance deficiencies. While acknowledging some improvement, he found that she was still having problems with customer service and the bring-up system. Hanenberger decided, however, to give Peele another 30 days to correct these deficiencies because there had been a week during the review period where she had been dealing with personal issues.

On June 2, 1998, Hanenberger conducted Peele's quarterly review. In his written evaluation, he noted "there are still files that lack the proper investigation time and contact times to meet best practices . . . . It appears to me that you work hard on the area's [sic] that we have outlined in the previous meeting[s] until I indicate that you have improved and then the performance in that given area slips again." Hanenberger concluded the evaluation by advising Peele that he would review her files again in 30 days, and informing her that at the end of this time period, "I should not have any OAL's printed that [have] any of these [performance deficiencies]."

In May and June of 1998, Kearns and

Hanenberger discussed Peele's deteriorating job performance. On June 18, 1998, Kearns reviewed Peele's files and noted the following deficiencies: "bring-up card was left in the file and never used"; "this file is a disgrace . . . file has not been touched since 4/29/98 . . . bring up record in file shows last date as of 12/18/97"; "another poor file--reported 5/19/98 and the only investigation in file is a police report . . . file has not been touched since 5/27/98"; and "Pat took 6 days to reach insured for statement . . . absolute clear liability . . . but it still took Pat 3 weeks to CW/P call receive." Shortly after Kearns's review of Peele's files, he and Hanenberger decided to give her a "provisional rating." The provisional rating form defines the rating as reflecting "an unacceptable level of employee performance," and includes a "final warning that performance or behavior must change."Pursuant to company policy, Kearns sought approval from Country Mutual's human resources department before issuing this rating to Peele.

On June 23, 1998, Kearns received approval from Judy Garee, the company's manager of compensation, to place Peele on a provisional rating. Peele was notified of the rating that same day. The provisional rating required Peele, at a minimum, to conduct "timely, thorough and meaningful" investigations, comply with Best Practices, actively use the bring-up system, and properly apply the comparative negligence standard to her claims. Peele signed the provisional rating form, acknowledging that she understood "that this is her final warning . . . and [that] at anytime she fail[ed] to comply with what has been outlined, her employment with Country Companies [would] be terminated."

On August 7, 1998, Hanenberger reviewed 63 of Peele's files from the previous month. He noted that ten of the files did not meet the provisional rating's requirements. Hanenberger summarized his findings in a memorandum to Kearns. Shortly thereafter, Kearns and Hanenberger decided to recommend that Peele be terminated. Kearns consulted with Garee and Joe Painter, the company's director of claims, and they approved the termination. On August 14, 1998, Kearns

and Hanenberger informed Peele of the company's decision. A few weeks later, Country Mutual hired Christopher Mason (then age 24) to fill her former position./7

On February 2, 1999, Peele filed suit against Country Mutual alleging that she had been terminated in violation of Title VII, 42 U.S.C. sec. 2000e-2, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. sec. 623. Peele alleged that she worked for the company's claims department from 1989 until 1998, at which time she was terminated and replaced by a man in his late twenties. Country Mutual moved for summary judgment, and the district court granted the company's motion. Peele appeals this decision.

II.

We review de novo the district court's decision to grant summary judgment, construing all facts, and drawing all reasonable inferences from those facts, in favor of Peele, the non-moving party. See, e.g., Hall v. Bodine Elec. Co., 276 F.3d 345, 352 (7th Cir. 2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

On appeal, Peele argues that Country Mutual favored male and younger employees over female and older employees, and that the company used poor job performance as a pretext to terminate her, because she is an older woman, in violation of Title VII and the ADEA. Title VII makes it unlawful for employers to terminate employees because of their sex, see 42 U.S.C. sec. 2000e-2(a)(1), and the ADEA prohibits employers from terminating employees on the basis of age. See 29 U.S.C. sec. 623(a). Because Peele presents no direct evidence of discrimination, her Title VII and ADEA claims proceed under the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001).

Under McDonnell Douglas, a plaintiff establishes a prima facie case of sex or age discrimination if she demonstrates, by a preponderance of the evidence, that: (1) she is a member of a protected class; (2) at the time of termination, she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male or younger employees. See, e.g., Markel v. Bd. of Regents of Univ. of Wisconsin Sys., 276 F.3d 906, 911 (7th Cir. 2002); Bennington v. Caterpillar, Inc., 275 F.3d 654, 659 (7th Cir. 2001). Once the plaintiff establishes a prima facie case of sex or age discrimination, the employer, to avoid liability, must then produce a legitimate, nondiscriminatory reason for the employee's termination. See, e.g., Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1009 (7th Cir. 2000). If the employer offers a legitimate, nondiscriminatory explanation for the termination, the plaintiff must then rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual. Id. Pretext "means a dishonest explanation, a lie rather than an oddity or an error." Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000). A plaintiff does not reach the pretext stage, however, unless she first establishes a prima facie case of discrimination. See, e.g., Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir. 1997); Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1090 (7th Cir. 2000); Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997).

A. The District Court's Opinion

In rendering its opinion, however, the district court bypassed the prima facie analysis altogether, noting:

[L]ike the mine-run employment discrimination case, this case boils down to the plaintiff's job performance. If Country [M]utual has articulated a legitimate reason for termination (and it has, performance) then Peele must show that reason was pretextual, a lie. Did Country Mutual believe Peele performed

satisfactorily, i.e., was Country Mutual lying when it said it was firing her for performance reasons? The second prong of the prima facie test merges with the pretext inquiry in this situation, and it makes more sense to simply proceed to the ultimate issue of pretext in deciding the summary judgment motion.

While it might be tempting to take the "sensible" shortcut by jettisoning the prima facie analysis altogether and moving directly to the pretext inquiry, this circuit does not endorse such a practice. We have consistently held that "the prima facie case under McDonnell Douglas must be established and not merely incanted." See, e.g., Coco, 128 F.3d at 1178. If a plaintiff is unable to establish a prima facie case of employment discrimination under McDonnell Douglas, an employer may not be subjected to a pretext inquiry. See, e.g., Contreras v. Suncast Corp., 237 F.3d 756, 761 (7th Cir. 2001); Espo Eng'g Corp., 200 F.3d at 1090; Coco, 128 F.3d at 1179; Plair, 105 F.3d at 347. As such, the district court should have first determined whether Peele established prima facie cases of sex and age discrimination before subjecting Country Mutual to a pretext inquiry.

B. Prima Facie Analysis of Peele's Claims.

We begin our analysis then by addressing Country Mutual's argument that Peele failed to establish a prima facie case of sex or age discrimination. The parties do not dispute that Peele, a woman over the age of 40, is a member of two protected classes or that she suffered an adverse employment action. Country Mutual does contend, however, that Peele failed to demonstrate that she was meeting the company's legitimate employment expectations at the time of her termination and that the company treated her less favorably than similarly situated male or younger employees. Country Mutual claims that the documentary evidence of Peele's deteriorating job performance as a CR2 is overwhelming and uncontested./8 The company also argues that there is no credible evidence to support her allegations of disparate treatment. According to Country Mutual, at the time the company was documenting Peele's declining performance, both male and younger employees were also being

disciplined or terminated for similar performance deficiencies.

Peele does not challenge the validity or veracity of the documentary evidence submitted by Country Mutual to demonstrate her poor job performance as a CR2. Instead, she contends that the company's evidence is "weak at best," and denies that her job performance was materially deficient. Peele claims that the company only found problems with a "handful of the hundreds of files she handled in 1998." She also points to the depositions of former co-workers who testified that she was performing her job in a satisfactory manner at the time of her termination. Additionally, Peele contrasts her job performance reviews with those of allegedly similarly situated male and younger employees in an attempt to demonstrate that the company applied its legitimate employment expectations against her in a disparate manner. Finally, she argues that Country Mutual's allegations of poor job performance are pretextual. According to Peele, she was terminated as a result of the company's formal policy of cutting costs by eliminating older workers (through a voluntary early retirement program), and because her supervisor, Gary Hanenberger, wanted a "younger, more male office."

1. Was Peele meeting Country Mutual's legitimate employment expectations at the time of her termination?

The first question we must consider is whether Peele was meeting Country Mutual's legitimate employment expectations at the time of her termination. "[T]he 'legitimate expectations' element in the ubiquitous burden-shifting formula of McDonnell Douglas [is crucial]." Coco, 128 F.3d at 1179. If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be "put to the burden of stating the reasons for [her] termination." Coco, 128 F.3d at 1179. If the plaintiff has direct evidence of discrimination "well and good; but if he has nothing else, and is therefore totally reliant on the McDonnell Douglas formula, he is out of luck if he can't show that he was meeting

his employer's legitimate expectations."
Id. See also Brummett v. Lee Enterprises,
Inc., 284 F.3d 742, 745 (7th Cir. 2002);
Contreras, 237 F.3d at 761; Espo Eng'g
Corp., 200 F.3d at 1090; Biolchini v.
Gen. Elec. Co., 167 F.3d 1151, 1154 (7th
Cir. 1999); Plair, 105 F.3d at 347.

   After carefully reviewing the record, we
agree with Country Mutual that the
evidence of Peele's deteriorating job
performance is overwhelming. In the 18
months leading up to her termination, she
was repeatedly warned by the company,
both verbally and in writing, that her
job performance was unacceptable. As our
recitation of the facts demonstrates,
Peele received no less than nine critical
written evaluations of her job
performance as a CR2. Time and time
again, Country Mutual informed Peele of
the specific deficiencies in her job
performance, and she failed to correct
them--despite being given numerous
opportunities by the company to do so.
Moreover, notwithstanding her allegations
of discrimination, Peele has never
challenged the veracity of any of the
performance deficiencies noted in the
company's written evaluations of her job
performance, including those made by
Hanenberger.

   Furthermore, while Peele casts
Hanenberger as the antagonist in this
case, the record clearly shows that
several of Country Mutual's other
employees also criticized her job
performance as a CR2, and participated in
the decision- making process that
ultimately resulted in her termination.
The following facts are undisputed: (1)
Dennis Bates, Hanenberger's predecessor,
criticized Peele's job performance in
March 1997; (2) Donald Weber, a district
training coordinator, noted several
problems with Peele's files after
reviewing the findings of a 1998
supervisor's audit; (3) Michael Kearns, a
district manager, reviewed Peele's files
in June 1998, and found several
performance deficiencies (e.g., calling
one file "a disgrace"); (4) Kearns and
Judy Garee, the company's manager of
compensation, along with Hanenberger,
collectively made the decision to place
Peele on a provisional rating; and (5)
four employees were involved in the
decision to terminate Peele: Kearns,
Hanenberger, Garee, and Joe Painter, the

company's director of claims. This evidence shows that Hanenberger was not alone in his criticism of Peele, and that a consensus was reached by several Country Mutual employees that her failure to meet the company's legitimate employment expectations over an 18-month period warranted her being terminated.

We are unpersuaded by Peele's argument that evidence of her poor job performance must be balanced against the "favorable performance reviews, raises, and promotions" she received during her eight-plus years with the company. In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination." Karazanos v. Navistar Intern. Transp. Corp., 948 F.2d 332, 336 (7th Cir. 1991). See also Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998). Furthermore, prior job performance "evaluations, standing alone, [do not] create a genuine issue of triable fact when . . . there have been substantial alterations in the employee's responsibilities and supervision in the intervening period." Fortier, 161 F.3d at 1113 (emphasis added). The bulk of the evidence documenting Peele's performance deficiencies relates to her tenure as a CR2. Her responsibilities and work load as a CR2 were substantially different from those associated with her previous positions. The positive performance evaluations Peele received as a CR1, and, to even a lesser extent as a CSR, are therefore of no relevance.

Finally, we have held that the general statements of co- workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated. See, e.g., Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases . . . give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."). See also Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125 (7th Cir. 1994);

Kephart v. Inst. of Gas Tech., 630 F.2d 1217, 1218-19, 1223 (7th Cir. 1980). For all of the foregoing reasons, we conclude that Peele was not meeting Country Mutual's legitimate employment expectations at the time of her termination.

2. Did Country Mutual apply its legitimate employment expectations against Peele in a discriminatory manner?

Peele argues, however, that even if she was not meeting Country Mutual's legitimate employment expectations at the time of her termination, she can still establish prima facie cases of sex and age discrimination because the company applied its expectations against her in a discriminatory manner. When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated male and younger employees in a more favorable manner), the second and fourth prongs of McDonnell Douglas merge--allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry. See, e.g., Curry v. Menard, 270 F.3d 473, 478 (7th Cir. 2001); Gordon v. United Airlines, Inc., 246 F.3d 878, 886-87 (7th Cir. 2001); Oest v. Illinois Dept. of Corr., 240 F.3d 605, 612 n.3 (7th Cir. 2001); Flores v. Preferred Tech. Group, 182 F.3d 512, 515 (7th Cir. 1999); Coco, 128 F.3d at 1180.

Peele claims that while the company strictly enforced the Best Practices standards against her, it did not do so with respect to similarly situated male and younger employees. A plaintiff may demonstrate that another employee is "similarly situated" to her by "show[ing] that there is someone who is directly comparable to her in all material respects." Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). See also Greer v. Bd. of Educ. of City of Chicago, Illinois, 267 F.3d 723, 728 (7th Cir. 2001); Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). In determining whether employees are similarly situated, "a court must look at all relevant factors, the number of which depends on

the context of the case." Radue, 219 F.3d at 617. Furthermore, "in disciplinary cases--in which a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason--a plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct." Id. (emphasis added). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. at 617-18 (emphasis added).

Specifically, Peele contends that Hanenberger was far more critical in his evaluations of female and older employees than in those he conducted for similarly situated male and younger employees. In support of her argument, Peele identifies four employees--Christopher Mason, Thomas Kyle, Matthew Smith, and Laura Dempski, who she claims are "similarly situated" and were treated more favorably by the company in the application of its legitimate employment expectations./9 Peele begins by comparing her situation to that of Christopher Mason, the individual Country Mutual hired to replace her. She contends that while the company criticized Mason's job performance, it never disciplined him. The criticisms Peele references, however, are minor and quoted entirely out of context./10 The record contains four written evaluations of Mason's job performance, and each of them is positive. Additionally, one of the evaluations, a 1998 supervisor's audit, was conducted by Donald Weber, not Hanenberger. This demonstrates that at least one other employee at Country Mutual was of the opinion that Mason was meeting the company's performance expectations. For virtually identical reasons, Laura Dempski is also not similarly situated to Peele./11 In any event, Country Mutual's criticisms of Mason and Dempski pale in comparison to those lodged by the company against Peele (i.e., nine critical written evaluations in 18 months as a CR2), and therefore neither is similarly situated to her for purposes of establishing a prima facie case of sex or age discrimination./12

As for Thomas Kyle and Matthew Smith, even were we to assume that they were similarly situated to Peele,/13 the record clearly demonstrates that neither of these gentlemen was treated in a more favorable manner by Country Mutual. As the district court noted, "the undisputed evidence shows that Thomas Kyle was on his way out for reasons akin to Peele, and [that] Matthew Smith was also terminated for similar reasons . . . ."

  If a district court determines that a plaintiff has failed to identify a similarly situated co-worker outside of her protected class, or that the co-worker identified by the plaintiff, while similarly situated, was not treated in a more favorable manner, it need not address any of the underlying allegations of disparate treatment. See Patterson, 281 F.3d at 680 (holding that "we cannot compare [an employer's] treatment of [a plaintiff with that co-worker] . . . [if the plaintiff] fail[s] to meet her burden of establishing that [the co-worker] is a similarly situated employee."). See also Radue, 219 F.3d at 618; Plair, 105 F.3d at 350. Peele's failure to offer such "comparables" dooms her Title VII and ADEA claims, see, e.g., Radue, 219 F.3d at 619-20, and obviates the need to address her particularized allegations of disparate treatment by Country Mutual.

  In this case, the record clearly demonstrates that Peele's job performance was unsatisfactory. Furthermore, there is no evidence that Country Mutual enforced its legitimate employment expectations in a disparate manner. As such, we are unable to infer discriminatory intent under the McDonnell Douglas framework. See, e.g., Biolchini, 167 F.3d at 1154./14 Because Peele has failed to establish prima facie cases of sex and age discrimination, we need not address her pretext argument. See, e.g., Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1036 (7th Cir. 1999); Coco, 128 F.3d at 1178-79.

  We, therefore, affirm the district court's decision to grant Country Mutual's motion for summary judgment, but do so on the alternative ground that Peele failed to make out a prima facie case of sex or age discrimination. See, e.g., Slaney v. The Int'l Amateur Athletic Fed'n, 224 F.3d 580, 597 (7th

Cir. 2001) (holding "[a]n appellate court may affirm the district court's [decision] on any ground supported by the Record, even if different from the grounds relied upon by the district court.").

III.

   For the foregoing reasons, we AFFIRM the decision of the district court.

FOOTNOTES

/1 At that time, Country Mutual rated its CSRs as "acceptable," "provisional," "competent," or "commendable." A "competent" rating was the second highest rating that a CSR could receive, "commendable" being the highest.

/2 The "Meets Requirements" designation is defined as follows: "Employee's performance fully meets the requirements/expectations of the position and employee has demonstrated consistent effort, expertise, and accomplishments."

/3 More specifically, Best Practices includes con-tacting the insured within one hour of a claim, obtaining an appraisal within 24 hours, collect-ing witness statements within 24 hours, and making a preliminary decision on the claim within three days.

/4 Peele concedes that she was adequately trained for the CR2 position, that she understood what was required of the position, and that she chose not to avail herself of certain company-paid training opportunities.

/5 Bates did, however, temper his criticism of Peele by noting "Pat is trying to get through a lot of files that were left by Dennis [her predecessor] and keep up with the files she is [currently] getting."

/6 Every year, Country Mutual's district claims manager and claims supervisors travel to each of the company's claims offices (within a district) to review, at random, the files of all claims representatives.

/7 Country Mutual hired another CR2, Laura Dempski (then age 32), for the Grayslake office less than two months after Peele's termination.

/8 Country Mutual argues that Peele's job perfor-mance began deteriorating in January 1997, when she was promoted to CR2, and got progressively worse until she was terminated by the company in August 1998.

/9 At the time of Peele's termination, Mason was 24 and Dempski was 32. In 1996, Country Mutual hired Kyle at age 31 and Smith at age 28.

/10 Peele notes that: (1) in Mason's March 1999 quarterly review, Hanenberger advised him that he needed to improve his contacts with insureds; and (2) a 1998 supervisor's audit advised Mason that he needed to "watch comparative," and noted that one of his files did not contain a police report.

/11 Dempski was hired by Country Mutual as a CR2 for the company's Grayslake office two months after Peele's termination. Peele only refers to one written evaluation of Dempski's performance by Hanenberger. This evaluation, an annual review from 1999, contains some criticisms, but also concludes that Dempski's overall job performance that year was "good."

/12 Furthermore, none of the excerpts Peele references from the depositions of Dawn Jones (CR2), Joyce Harrington (CSR), and Merrill Drake (appraiser)--all former employees of Country Mutual who criticize Mason's job performance--undermines our conclusion in this regard. As plaintiff, Peele had the burden of establishing by a preponderance of the evidence that she and Mason were similarly situated. See, e.g., Patterson, 281 F.3d at 680. The deposition excerpts she relies on, however, are merely assertions by co-workers that they believed Peele was a better CR2 than Mason. They do not, however, specifically challenge the veracity of the positive performance evaluations given to Mason by Hanenberger and Weber. Nor do any of their statements establish that Mason's situation was in any way comparable to Peele's. Furthermore, there is nothing in the record indicating that these non-managerial co-workers were in a position to offer meaningful comparisons of the respective job performances of these two individuals. The deposition excerpts are, therefore, insufficient to demonstrate that Mason and Peele were similarly situated. See Dey, 28 F.3d at 1460; Anderson, 13 F.3d at 1125; Kephart, 630 F.2d at 1218-19, 1223.

/13 It is certainly debatable whether Kyle and Smith are similarly situated to Peele. Kyle had a more advanced position than Peele, he was a CR3 (i.e., he handled bodily injury claims) with "property duties," and Matthew Smith was a CR1.

/14 In passing, we note that Peele's allegation that Country Mutual discriminated against its older workers by offering them, in February 1998, the opportunity to participate in a voluntary early retirement program ("VERP") is without merit. As we noted in Henn v. Nat'l Geographic Soc., 819

F.2d 824, 828 (7th Cir. 1987), "an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination." Additionally, Peele's speculation that Country Mutual stood to save money if she retired early, and therefore retaliated against her when she declined to accept the company's VERP offer, is undermined by the evidentiary record. Just one month after the deadline for participating in VERP expired, Peele informed Country Mutual that she wished to participate in VERP. The company, however, advised her that the window for accepting the early retirement package had closed.