In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3862

STEVEN L. ANDERS,

*Plaintiff-Appellant,*

*v.*

WASTE MANAGEMENT OF WISCONSIN,
INCORPORATED, subsidiary, and
WASTE MANAGEMENT, INCORPORATED,
a parent corporation,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 483—**J.P. Stadtmueller**, *Judge.*

ARGUED APRIL 6, 2006—DECIDED SEPTEMBER 12, 2006

Before BAUER, WOOD, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* On November 12, 2002, Steven L. Anders, a waste hauler for Waste Management of Franklin, Wisconsin, attempted to assault his District Manager, William Snow, in front of numerous co-workers. It is no surprise that he was fired as a result of this action. Anders, however, filed suit in the district court claiming that his dismissal violated the Family and Medical Leave Act, the Americans with Disabilities Act, Title VII, 42 U.S.C. § 1981, and the Wisconsin Fair Employment Act. The district court

granted summary judgment to the defendants, and we affirm.

## I. Background

Before addressing the underlying facts of the case, we must first demarcate the scope of the record properly before this Court on appeal. Following Waste Management's motion for summary judgment, Anders was required, as per Eastern District of Wisconsin local Rule 56.2, to submit "a specific response to the defendants' proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of fact exists." Civ. L.R. 56.2(b)(1). As an example of the intended form, we note that Waste Management's Proposed Findings of Fact (PFOF) was a ten-page document containing sixty-five brief, numbered paragraphs. Anders's response, however, was a sprawling sixty-five *page* argument that referenced Waste Management's proposed findings only in passing. After reviewing his submission, the district court found that "[o]n the whole, Anders'[s] response is a disjointed, convoluted, and hopeless mess; his non-compliance with Rule 56.2(b) is more than substantial—it is *total*." Tr. Rec. 60 at 3 (emphasis in original). Under Civ. L.R. 56(e), the district court rejected Anders's submitted response to the PFOF and held that there was no "genuine material issue as to any proposed finding of fact to which no response is set out." In other words, it adopted Waste Management's proposed findings as the undisputed facts on record. *Salvadori v. Franklin School Dist.*, 293 F.3d 989, 992 (7th Cir. 2002); *see Waldridge v. American Hoescht Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994). We review the district court's decision for an abuse of discretion, and find no error. *See Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1108 (7th Cir. 2004) (citing *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)).

Additionally, Anders claims that the district court then went outside of the defendant's legal arguments and proffered findings when granting summary judgment. Were this the case, he would be entitled to rely on the entire record here on appeal. *See Nabozny v. Podlesny*, 92 F.3d 446, 450 (7th Cir. 1996) (finding district court erred in granting summary judgment on grounds and facts not offered by moving party). But the district court committed no such error. Anders appears to argue that because the Order granting summary judgment cited to evidentiary material beyond just the PFOF, *e.g.* "Drephal Dep. at 19," that the lower court violated some categorical rule set forth in *Nabozny*. In *Nabozny*, however, we did not limit our review solely to the PFOF. Instead, we stated that "[i]f the court elects to rely on legal arguments and evidence *not incorporated in, or submitted with*, the summary judgment motion, the court is obligated to consider the entire record 'to ensure that the record reveals no issue of material fact.'" *Id.* (emphasis added).

Anders's vague and conclusory statements aside, our comparison of the district court's Order granting summary judgment and Waste Management's Memorandum and PFOF in support of their motion demonstrates that each fact cited in support of the Order is indeed present or incorporated into the motion.[1] *See* Civ. L.R. 56(a). Specifically, the deposition of Regional Manager Dennis Drephal, which, at oral argument, Anders claimed was

---

[1] *See* Defendant's Notice of Motion and Motion for Summary Judgment, stating: "This motion is based on FED. R. CIV. P. 56 and Civil L.R. 71 and 56.2, upon the memorandum of law, affidavits and other documents submitted with this motion, and upon all the files and proceedings in this case." Tr. Rec. 27; Defendant's Memorandum in Support of Their Motion for Summary Judgment, stating: "Waste Management incorporates those undisputed facts into this Memorandum by reference and directs the Court to those facts, which support the present Motion." Tr. Rec. 28 at 2.

not referenced in the PFOF, is cited in paragraphs 15, 16, 37, 39, and 58. The district court's variation in citation form is a far cry from the repeated errors made by the district court in *Nabozny*, where summary judgment was granted on certain claims where the defendant offered no legal rationale. *Id.* at 50; *compare Brown v. United States*, 976 F.2d 1104, 1108-10 (7th Cir. 1992) (expanding scope of record on appeal where summary judgment was granted on basis different than that offered by moving party). Further, the legal grounds upon which the court granted summary judgment on Anders's retaliation claim, the other point of contention raised in his appellate brief, are wholly consistent with the timing and causation argument made by Waste Management. Thus, Anders's claim on this initial point fails. With this legal decision in mind, we turn now to establish the facts of the case.

Anders, an African-American male, was a unionized "roll-off" waste-hauler employed at Waste Management's facility in Franklin, Wisconsin. His supervisor during the period of time relevant to this case was Manager Dave Koch, who was, in turn, supervised by District Manager William Snow. Over Snow was Regional Manager Dennis Drephal. Waste Management's regional management facility, where Drephal worked, however, was in Menomonee Falls, Wisconsin, thirty miles from Franklin.

As a roll-off driver, Anders had no pre-determined route. Each morning when he reported to work he was handed a route slip that detailed his itinerary for that day. This arrangement was company policy and was set forth in Anders's labor agreement. When he arrived at the Franklin facility on November 12, 2002, he was handed his route slip by supervisor John Pena. Anders claims that after receiving the slip he was told by a co-worker that the stops on his route had been serviced the day before. He claims that were this the case, the routes would not need to be serviced again the next day, and that this would negatively affect his

incentive pay. Waste Management policy, however, states that a driver should attend to his route even if he believes it was serviced the day before. The reason behind this rule is that some customers intentionally scheduled back to back service.

Acting under the belief that his route would not need to be serviced again, Anders decided to leave work. Claiming that he was feeling sick, *i.e.*, sleepy, shaky, and experiencing a headache, he told Pena that he was going home. Shortly after Anders left the facility, however, Bob O'Brien told Pena that he overheard Anders say he was "going up to get [Regional Manager] Dennis Drephal and then he was coming down to get [Manager] Dave [Koch]." PFOF ¶ 20. Pena immediately had someone from the Franklin facility call the Menomonee Falls office and notify them of Anders's intentions.

Despite having told Pena that he was not feeling well and needed to go home, Anders drove the thirty miles to the Menomonee Falls office. Upon his arrival, he was met in the facility parking lot by John Schiller, who had received the warning call from Pena. According to Schiller, Anders wanted to talk to Drephal because he was unhappy with his route assignments and supervisors, Koch and Snow. Schiller told Anders that it was not acceptable for him to have walked off the job, and that he could wait inside the building for Drephal to arrive.

Anders went inside briefly, but soon returned to the parking lot. He claimed that as he waited for Drephal he began to shake, and his head and chest started hurting; so he went outside to get some fresh air. In the meantime, Schiller called Drephal, who told him to have Snow talk to Anders. After Schiller located Snow, the two men were on their way to meet Anders when another employee told them that he was outside lying on his car. Given that this was November, Schiller went to bring Anders back inside. This

did not go as planned. After a few minutes had passed, and Schiller had not yet returned, Snow and Sam Phillips walked out to the parking lot where they saw Anders first pound his fists into his car and then smash his cellular telephone into the ground. Anders became short of breath, and someone called the paramedics. At this point, Schiller went to lead Anders back into the building.

As Anders was being escorted into the building he attempted to attack Snow. At first he simply leered at Snow, but he then clenched his fists, lowered his shoulder into an aggressive stance, and charged. Snow was, to say the least, afraid. Schiller, who witnessed the entire event, had to position himself between the two men. Anders, Schiller said, was "mad as hell" while in the parking lot, briefly calmed down before heading back to the facility, and then became "very violent" upon seeing Snow. PFOF ¶ 31. Phillips, who also witnessed the event, described Anders as having moved toward Snow "with aggression," causing him to move back and exclaim "don't come after me." PFOF ¶ 33. Anders acknowledged that he did walk towards Snow, and that his behavior could have been interpreted as threatening.

This was not Anders's first aggressive incident in the workplace. His personnel records reflect that he received other disciplinary violations in 2002. Particularly, on October 24, he lost his temper with Koch after receiving a tardy notice. Both Koch and Pena testified that after being given the notice Anders threw his jacket to the ground and yelled at Koch in an insubordinate and boisterous manner. Anders does not dispute that this disagreement occurred.

These combined actions violated Waste Management's Rules and Regulations, which Anders acknowledged receiving and understanding upon starting work in 1996. Rule 7 prohibits fighting, assaulting, or otherwise endan-

gering any employee. Rule 11 prohibits insubordination, and the refusal or failure to follow Company procedures or to complete work assignments. Further, in 2001, Anders acknowledged receiving and understanding the Company's Code of Conduct, which included its Workplace Violence policy. The policy states, in relevant part, that Waste Management "does not tolerate violent behavior at [its] workplaces, whether committed by or against [their] employees. These behaviors are prohibited: making threatening remarks, causing physical injury to someone else, intentionally damaging someone else's property, and/or acting aggressively in a way that causes someone else to fear they could be injured." PFOF ¶¶ 8, 9.

Anders was subsequently fired from Waste Management. It is undisputed that Drephal was the final decision-maker.[2] In choosing to fire Anders, Drephal considered the events of November 12 as described by Pena, Snow, Schiller, and Phillips. Additionally, Supervisor Tom Dixon told Drephal that Anders had been involved in an altercation with another employee, and Maintenance Manager Brian Schlomann informed Drephal that Anders had been short with him on a prior occasion. Further, Snow informed Drephal that Anders commented to him on November 6, that "if things did not improve at Waste Management someone was going to get hurt." PFOF ¶ 40.

Anders claimed that he suffered from "panic, anxiety, depression disorder" (panic disorder). PFOF ¶ 53. The disorder, he submits, was the cause of his behavior on November 12. Further, he claims that he requested leave

---

[2] Despite his portraying, on appeal, Drephal's decisionmaking status as an outstanding question of fact, Anders conceded this point in briefing before the trial court. *See* Brief of Plaintiff in Opposition to Defendants' Motion for Summary Judgment at 20.

under the FMLA on November 6, 2002, but that Waste Management denied the request. Snow testified that he and Anders did speak on November 6 regarding Anders's health. During the conversation, he told Anders that the company would give him time off to see a doctor if it was needed. Snow said that Anders also wanted to talk about routes and compensation that day, and that he had to remind Anders the routes were not assigned to specific drivers and that the incentive compensation was bound to fluctuate. Snow also noted that, between August and November, the overall haul volume decreased, and that numerous drivers experienced a drop-off in their incentive pay scheme. Regarding Anders's claim that he informed the company of his condition, Snow said Anders did not report experiencing headaches or sleeplessness that day.

Anders's union elected not to challenge Waste Management's employment decision. Article 11 of his labor agreement explicitly stated that "[a]ny employee desiring a leave of absence from his employment shall secure written permission from both the Union and the Employer." PFOF ¶ 44. Anders sought no such permission. Further, Anders testified that prior to his termination he had not been advised by a physician that he was in need of a leave of absence.

After being terminated from Waste Management, Anders was hired by an industry competitor, City Wide Disposal. In 2003, Waste Management acquired City Wide's assets and hired a number of their employees. Anders was not re-hired. This decision, Waste Management claims, was a standard application of company policy based on the same review that led them to fire Anders in the first place.

On May 23, 2003, Anders filed this suit in the Eastern District of Wisconsin. He claimed his termination violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (FMLA); the Americans with Disabilities Act, 42 U.S.C. § 12101 (ADA); Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981; the Thirteenth Amendment; and the Wisconsin Fair Employment Act, Wis. Stat. §§ 111.31-111.395 (WFEA). The district court had proper jurisdiction over the WFEA claims under 28 U.S.C. § 1367. On June 23, 2005, the court granted summary judgment for Waste Management. Pursuant to FED. R. CIV. P. 59(e), 60(b), Anders made a "Motion to Alter and Amend Judgment and Relief from Judgement and Order." The district court denied his motion on August 29, 2005. This appeal followed. Anders argues now that there were genuine issues of material fact as to each of his claims.

## II. Analysis

We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). Summary judgment is appropriate if the moving party demonstrates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing summary judgment may not rest upon mere allegations or denials contained in their pleadings; instead, it is incumbent upon them to introduce affidavits or other evidence setting forth specific facts showing a genuine issue for trial. *See, e.g.*, *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003); *see also Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995).

## A. Race Discrimination

We examine first Anders's claim that Waste Management fired him on the basis of race. This portion of our review

includes his arguments for relief under Title VII, § 1981, and the WFEA. At the outset, we note that the relevant examination is the same for both Title VII and § 1981. *See Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006). Further, in many respects, the WFEA is identical to Title VII, with the Wisconsin Supreme Court seeking guidance, at times, from federal appellate precedent when applying their own law. *See Marten Transp., Ltd. v. Dep't of Industry, Labor, and Human Relations*, 501 N.W.2d 391, 395 (Wis. 1993); *Grann v. Madison*, 738 F.2d 786, 793-94 (7th Cir. 1984). Therefore, we subject all three claims to the same review.

Because Anders presented no direct evidence of discrimination, his Title VII, § 1981, and WFEA claims must proceed under the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Under *McDonnell Douglas*, the initial burden rests with the plaintiff to establish a prima facie case. *Scaife*, 446 F.3d at 739. In a claim for discrimination, the employee may satisfy this burden by providing evidence that: "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations at the time of the alleged adverse action; (3) he was subjected to an adverse employment action; and (4) the employer treated similarly situated employees not in the protected class more favorably." *Id.* If the plaintiff is unable to establish each element of this prima facie case, summary judgment must be entered in favor of the defendant. *See Peele*, 288 F.3d at 327.

Given the scope of the record before us, Anders fails to establish either that he was meeting his employer's legitimate expectations, or that he was treated differently from similarly situated employees. On the former point, the inquiry must focus on Anders's performance at the time of his dismissal. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). It cannot be disputed that

his behavior on November 12 failed to meet Waste Management's "legitimate expectations" as established by its Code of Conduct and Workplace Violence policy. That morning, Anders walked off the job site at Franklin, drove nearly 30 miles to confront his managers, and then attempted to attack Snow in front of numerous employees. Even considering Anders's contention that Pena gave him permission to leave the facility, this permission was conditioned on the fact that he said he was ill and wanted to go home. Which, again, is not what he did. It was only the beginning of his aggressive and violent conduct. *See Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352 (7th Cir. 1997) (affirming grant of summary judgment where plaintiff threatened co-worker). And while Anders's claims that his behavior was not intended to be threatening, he acknowledged that it may have been interpreted as such. This lone claim of misinterpretation is not sufficient to create a genuine issue of material fact when compared to the testimony of Pena, Snow, Schiller, and Phillips.

When considering the latter issue, his failure to establish that he was treated less favorably than similarly situated employees of a different race, we look to many different factors. *See generally Ajayi v. Aramark Bus. Srvs.*, 336 F.3d 520, 532 (7th Cir. 2003). Specifically, Anders must show that he is similarly situated in regard to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citing *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995)). "This normally entails a showing that the [comparable] employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. While Anders claims on appeal that there were four white, comparable Waste Management employees who engaged in analogous acts of aggression, the record is devoid of any information as to the specifics of their actions, their super-

visor, or any mitigating circumstances. *See Crawford v. Ind. Harbor Belt R.R. Co.*, 2006 WL 2422642, No. 05-2825, slip op. at 5 (7th Cir. Aug. 23, 2006). And so, Anders's claim of race discrimination must fail, too. We consider next his claim under the ADA.

## B.  Americans with Disabilities Act

For Anders to establish a claim of disability discrimination, he must first demonstrate that he is disabled within the meaning of the ADA and the WFEA. To prove this fact he can show that he has "(1) a physical or mental impairment that substantially limits him in one or more major life activities . . .; (2) a record of such an impairment; or (3) [is] regarded [by the employer] as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). If his condition does not meet one of these categories, he is not disabled under the ADA. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). Similarly, the WFEA requires a demonstration of "a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work." § 111.32(8)(a). Anders is unable to satisfy the requirements of either statute.

Even considering the facts in a light most favorable to his claim, we see that Anders's panic disorder lasted, at most, from sometime around November 6 until shortly after November 12. After it was diagnosed he testified, "things . . . panned out greatly," and he could do his job "110 percent." As the Supreme Court ruled in *Toyota Motor Mfg., Ky. v. Williams*, a short-term impairment such as this does not rise to the level of disability as defined by the ADA. *See* 534 U.S. 184, 195 (2002). Instead, Anders must have demonstrated that the impairment limited a major life activity on a permanent or long-term basis. *Id.* at 195, 198; *see also Ogborn v. United Food and Commercial Workers Union*, 305 F.3d 763, 767-68 (7th Cir. 2002) (holding an

eight week bout of depression was not a disability as defined by the ADA). Additionally, Anders's inability to meet the requirements of the ADA renders his argument on appeal, that Waste Management failed to accommodate his disability, moot. There was simply nothing to accommodate.

Likewise, under the WFEA, Anders carries the burden of establishing that his condition is a handicap. *Am. Motors Corp. v. Labor & Indus. Review Comm'n*, 119 Wis. 2d 706, 710 (Wis. 1984). This fact is a question of law that may be met by establishing that he has a real or perceived impairment. *Id.* Wisconsin law defines an impairment as "a real or perceived lessening or deterioration or damage to a normal bodily function or bodily condition, or the absence of such bodily function or such bodily condition." *La Crosse Police & Fire Comm'n v. Labor & Indus. Review Comm'n*, 139 Wis. 2d 740, 761 (Wis. 1987). Again, even when viewed in the most favorable light, Anders's few experiences with his panic disorder do not indicate such a condition. *See, e.g.*, *Doepke-Kline v. Labor & Indus. Review Comm'n*, 704 N.W.2d 605, 610-11 (Wis. Ct. App. 2005) (holding ongoing asthma condition that caused repeated absences from work was not a handicap).

## C. Family and Medical Leave Act

Having rejected Anders's race discrimination and ADA claims, we turn next to his argument that Waste Management denied him medical leave on November 6 and after November 12, 2002. We agree that summary judgment was appropriate here, too.

The FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). As a threshold matter, Anders can not demonstrate that his claimed

anxiety disorder rendered him unable to perform the duties of his position prior to November 12, 2002. The record before us shows that the his one stand-out incident, the October 24 confrontation with Koch, stemmed from his being penalized for tardiness. Other than this, the facts show that he appeared for work on a regular basis and without incident.

Regarding his claim that Waste Management denied him FMLA leave on November 6, the record shows that Anders merely indicated he was not feeling well. Nothing that he said to Snow that day would have put Waste Management on notice that FMLA applied, thus placing them in a position to deny his request. *See Aubuchon v. Knauf Fiberglass, GMBH*, 359 F.3d 950, 952 (7th Cir. 2004). Additionally, Anders himself had no idea that such leave was necessary. In his deposition he stated that, as of that date, he had not seen a physician regarding his condition. Nor had he requested leave through the Waste Management human resources department or his labor union. These scant facts raise no genuine issue appropriate for trial.

We are left then, with Anders's behavior on November 12. But again, he cannot demonstrate that his inability to perform the duties of his job were the result of a serious health condition. While he claims on appeal that he left work that morning because he was not feeling well, he used the opportunity not to seek medical assistance, but, instead, to drive thirty miles to the Menomonee Falls office to confront his manager. It was this deliberate and aggressive act that yielded his termination, not his panic disorder. Indeed, his medical records from later that day indicate he was "angry at a supervisor at work" and was experiencing "current homicidal/assaultive ideation." PFOF ¶ 56. The FMLA "was designed to help working men and women balance the conflicting demands of work and personal life,"

it was not intended to excuse violence in the work place. *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024 (7th Cir. 1997). While we recognize that *Palmer* addressed an ADA claim, and thus is not directly on point, we find its reasoning instructive: there we declined to place the defendant employer on the razor's edge: "in jeopardy of violating the [law] if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone." *Palmer*, 117 F.3d at 352.

### D.  Failure to Re-Hire

Anders's last substantive point is that the district court erred in dismissing his Title VII race retaliation claim. He argues that Waste Management chose not to rehire him following their acquisition of City Wide because he had filed a complaint with the Equal Employment Opportunity Commission. But Anders has not pointed to any direct evidence of retaliation, nor has he shown that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse action even though he was performing his job in a satisfactory manner. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see also Burlington Northern Santa Fe Ry. v. White*, 126 S.Ct. 2405 (2006). Again, summary judgment was appropriate.

Finally, because the district court did not err in granting summary judgment on Anders's claims, we similarly find that it did not abuse its discretion in denying his motion to alter or amend judgment. FED. R. CIV. P. 59(e); *Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510, 515 (7th Cir. 2006). For failing to present an argument on his FED. R. CIV. P. 60(b) claim, the issue is waived.

### III.  Conclusion

For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

      Teste:

                         _____

                         *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*