# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 02-3471 & 02-3700

TERRY CERUTTI, DANIEL ALLEN, RODNEY BRYANT,
ET AL.,

*Plaintiffs-Appellants/Cross-Appellees*,

*v.*

BASF CORPORATION, GERARD SABO,
KATHY REARDON, ET AL.,

*Defendants-Appellees/Cross-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 8966—**George W. Lindberg**, *Judge.*

_____

ARGUED MAY 14, 2003—DECIDED NOVEMBER 21, 2003

_____

Before POSNER, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* In February 2000, BASF Corporation decided to restructure its styrenics operating unit. As part of this corporate reorganization, BASF terminated 23 employees at its styrenics manufacturing plant in Joliet, Illinois. Ten of those employees filed suit against BASF, alleging that the company fired and declined to rehire them

on the basis of age, race, or national origin in violation of the Age Discrimination in Employment Act ("ADEA") and Title VII. Some of the plaintiffs also brought claims against three individual BASF employees, alleging that they intentionally interfered with the plaintiffs' employment relationships because of their race or national origin in violation of 42 U.S.C. § 1981. The defendants filed a motion for summary judgment, which the district court granted. The defendants also filed a motion for sanctions against the plaintiffs' counsel, which the district court denied. The plaintiffs appeal the district court's decision granting the defendants' motion for summary judgment, and the defendants cross-appeal the court's denial of their motion for sanctions. We affirm.

## I.

BASF Corporation is headquartered in Mount Olive, New Jersey, and is comprised of 19 operating units, one of which is devoted to the company's styrenics production ("NPR Unit").[1] The products for BASF's NPR Unit are manufactured at plants throughout North America, including one in Joliet, Illinois, which manufactures various forms of polystyrene. As a result of financial losses suffered by the company's NPR Unit, BASF implemented a program of "Site Process Optimization" in 1998, which was completed in early 1999. Despite this program, the NPR Unit's performance for 1999 was still slightly negative and only a modest return on assets was projected for 2000. This resulted in BASF developing a new business plan that included the reorganization of virtually the entire NPR Unit, the purpose

---

[1] Styrene plastics are all-purpose plastics that can be found in thousands of different products: automobiles, CD cases, packaging, computer housing, monitors or printers (to name just a few).

of which was to "reduce the number of personnel and repopulat[e] the organization with individuals who demonstrated specific behavioral skills and attributes that BASF believed were necessary to [the unit's] future success, and who, going forward, 'could do more with less' in order to achieve the necessary [return on assets]." In February 2000, BASF formally notified the Joliet facility employees of its intention to restructure the NPR Unit.

In the first phase of the restructuring process, BASF offered a Voluntary Special Early Retirement Program ("VSERP") to all employees aged 53 or over who had ten or more years of service with the company as of December 2000. During the second phase, all employees who desired to continue their employment with the NPR Unit, young and old alike, were assessed to determine whether they possessed the "competencies" the company believed were necessary to effectively restructure the unit. Employees who lacked these competencies would be "deselected," i.e., terminated. To assist it with the assessment process, BASF retained the services of Development Dimensions International ("DDI"), a leader in the behavioral assessment field.

BASF began the restructuring process by categorizing all of the employees from its NPR Unit into "job families." Nine of the plaintiffs were placed in the "Operators" Job Family, i.e., hourly plant or lab workers, and one plaintiff, Pearl Adams, was placed in the "Individual Contributor" Job Family, which was designated for salaried, non-supervisory employees. Key competencies for each job family were then defined. Some of the competencies were developed through the joint efforts of BASF and DDI, whereas others were designed solely by BASF.

Shortly thereafter, DDI assessed personnel at the various NPR facilities nationwide. At the Joliet plant, 83 Operators and 13 Individual Contributors were evaluated with iden-

tical standard assessment techniques—i.e., problem-solving exercises, role-plays and targeted interviewing. These assessments were done over the telephone and DDI employees were not informed of the age, race or national origin of the BASF employees being evaluated. DDI forwarded its results to BASF for further consideration by the company's selection panels.[2] The selection panels were committees formed by BASF (and were comprised of individuals selected for leadership roles in the new organization) to act as the final arbiters on the competency levels of those individuals currently employed by the company in its NPR Unit. The six-member selection panel assembled to assess the competencies of employees in the Operators Job Family at the Joliet facility included: Kevin Biehle (a defendant in this action), Lawrence Brandin, Rich Harris, Gerard Sabo (also a defendant), Troy Shaner, and Thad Zdunich. The five-member selection panel for the Individual Contributors Job Family at the Joliet facility consisted of: Biehle, Brandin, Sabo, Shaner, and Rick Lee. Katherine Reardon, a defendant and BASF's Director of Human Resources for the Polymers Division (which includes the company's NPR Unit), attended all of the panel meetings held at the Joliet facility to oversee the implementation of the selection process and to ensure that the relevant guidelines were consistently applied.

The purpose of each selection panel was twofold: (1) to review DDI's scores and integrate them with the panels' collective knowledge of each employee's workplace behavior and performance; and (2) to evaluate additional

---

[2] The employees' scores were reported to BASF on "profile sheets" based on a three-point scale: "3" indicated a strength, "2" indicated a proficiency, and "1" indicated a developmental need.

competencies of each employee not considered by DDI. In reviewing DDI's competency evaluations, the selection panels applied the same three-point scale utilized by DDI to evaluate whether the scores given to an employee were consistent with his or her actual exhibited workplace behavior and performance. If no panel member voiced disagreement with a score assigned to an employee by DDI, it became final for that particular competency. Panel members who disagreed with a competency score were required to identify specific instances of workplace conduct that called into question the accuracy of the score given by DDI to the employee. This was then followed by a panel discussion on the behavioral examples cited by the objecting panel member(s). If the panel reached a consensus that the DDI score did not accurately reflect an employee's on-the-job behavior or performance, the score was increased or decreased accordingly.[3] The initial findings of the selection panels were then reviewed by BASF's legal department and analyzed by Roland DeLoach, BASF's Manager of Equal Employment Opportunity, for possible adverse impact. BASF was advised that the tentative results of the assessment process employed by the company did not have a statistically significant impact on any protected group. Upon being so advised, BASF finalized the decisions made by the selection panels, which were then conveyed to NPR Unit employees on June 2, 2000.

Thereafter, Pearl Adams, Daniel Allen, Rodney Bryant, Terry Cerutti, Richard Clinton, Steven Davis, Anita Krantz, James Perona, Steve Real, and Michael Severado—all of whom were terminated for having six or more developmen-

---

[3] At the time the selection panels rendered their decisions, its members were not aware that BASF had tentatively concluded that all employees with 6 or more developmental needs (out of the 14 competencies assessed) would be terminated.

tal needs—filed suit against BASF, Kevin Biehle, Kathy Reardon, and Gerard Sabo. All ten of the plaintiffs alleged that BASF fired and declined to rehire them because of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff Steve Real (who is Hispanic) and plaintiffs Pearl Adams, Daniel Allen, and Michael Severado (all of whom are black), also filed claims against BASF, alleging that the company fired and declined to rehire them on account of their race or national origin in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and against Biehle, Reardon, and Sabo, alleging that they intentionally interfered with these plaintiffs' employment relationships because of their race or national origin in violation of 42 U.S.C. § 1981. The defendants filed a motion for summary judgment, which the district court granted. The defendants also filed a motion for sanctions against the plaintiffs' counsel, which the court denied. The plaintiffs appeal the district court's decision granting the defendants' motion for summary judgment, and the defendants cross-appeal the court's denial of their motion for sanctions.

## II.

The plaintiffs argue that the district court erred in granting the defendants summary judgment for their age, race, and national origin discrimination claims. We review de novo the district court's decision to grant summary judgment, construing all facts, and drawing all reasonable inferences from those facts, in favor of the plaintiffs, the non-moving parties in this case. *Peele v. Country Mut. Life Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.

A plaintiff may prove employment discrimination under the ADEA, Title VII, and § 1981, using either the "direct method" or "indirect method."[4] *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727-28 (7th Cir. 1998). Under the direct method of proof, a plaintiff may show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose, such as race, national origin, or age. *Id.* at 727. Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). In short, "[d]irect evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.' " *Rogers*, 320 F.3d at 753 (citation omitted). A plaintiff can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Id.*; *see also Troupe v. May Dept. Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

If a plaintiff cannot prevail under the direct method of

---

[4] We employ essentially the same analytical framework to employment discrimination cases whether they are brought under the ADEA, Title VII, or § 1981. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999).

proof, he must proceed under the indirect method, i.e., the familiar *McDonnell Douglas* framework. *Adams*, 324 F.3d at 939. In the context of a large-scale workplace restructuring or reorganization (i.e., where the employer is "cleaning house" and essentially no one's job is safe), a plaintiff proceeding under the indirect method must, as an initial matter, show that: (1) he is a member of a protected class (e.g., race, national origin, age); (2) he was qualified to be retained or rehired; (3) he was discharged, not rehired, not promoted, or the like, as a result of the workplace re-structuring or reorganization; and (4) similarly situated employees outside of his protected class were treated more favorably by the employer.[5] *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 889-90 (7th Cir. 1997); *see also Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011-12 (7th Cir. 2000). If the plaintiff establishes a prima facie case of age, race, or national origin discrimination, the employer, to avoid li-ability, must then produce a legitimate, nondiscriminatory reason for the adverse employment decision. *Peele*, 288 F.3d at 326. If the employer offers a legitimate, nondiscrimina-tory explanation for its decision, the plaintiff must then "rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual [i.e., a lie]." *Id.* A plaintiff does not reach the pretext stage, however, unless he first establishes a prima facie case of discrimination under the indirect method. *Id.*

---

[5] An ADEA plaintiff who shows that someone "substantially younger" was retained need not prove that the replacement is outside the protected class. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003). This variation of *McDonnell Douglas*, however, is not at issue in this case because none of the plaintiffs attempts to make such a showing.

However, whether a plaintiff proceeds under the direct or indirect method of proof, the ultimate standard is the same: the plaintiff must demonstrate that the employer would not have made the adverse employment decision in question but for his membership in a protected class. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002); *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 571 (1998). With the foregoing principles in mind, we now consider the merits of the plaintiffs' respective claims.

## A. ADEA Claims

All ten plaintiffs allege that they were terminated and not rehired by BASF because of age discrimination. Specifically, the plaintiffs argue that they offered evidence sufficient to establish age discrimination under either the direct or indirect method of proof. In support of their direct method argument, the plaintiffs contend that: (1) the early retirement offer made by BASF to certain older employees in the first phase of the restructuring process was discriminatory and not truly voluntary; (2) either Jay Kline, the head of the NPR Unit, or Kathy Reardon, the director of human resources for the NPR Unit, stated at a restructuring meeting with employees: "There's no other way; it's going to be out with the old and in with the new"; and (3) several ageist statements were made by Thad Zdunich and Troy Shaner to plaintiff Daniel Allen (e.g., "[Allen] is going to handle the young pups" and "How is the old man doing today?"). For the reasons that follow, we conclude that the preceding evidence, even when viewed in its most favorable light, is insufficient to allow the plaintiffs to maintain claims against the defendants for age discrimination under the direct method.

To begin with, the plaintiffs' argument that BASF engaged in age discrimination simply by offering some of its older workers early retirement packages is a nonstarter. *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1163 (7th Cir. 1994) (holding that "[t]ruly voluntary retirements do not give rise to an inference of age discrimination"). Rather, "an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination." *Henn v. National Geographic Soc.*, 819 F.2d 824, 828 (7th Cir. 1987). Nor is it reasonable to infer that the retirement program offered by BASF in the first phase of the restructuring process was discriminatory or involuntary merely because some of the employees who accepted the company's offer did so out of a fear that they would not make the grade after being assessed. *Id.* at 828-29. The ADEA was not enacted to immunize older employees (i.e., those 40 and over) from being terminated for legitimate reasons (e.g., poor social skills, bad attitude, incompetency), but was instead designed to protect them from being discriminated against on the basis of their age. *Mullin v. Raytheon Co.*, 164 F.3d 696, 703 (1st Cir. 1999) (noting that " '[t]he ADEA was not intended to protect older workers from the often harsh economic realities of common business decisions and the hardships associated with corporate reorganizations, downsizing, plant closings and relocations') (citation omitted); *Allen v. Diebold, Inc.*, 33 F.3d 674, 677 (6th Cir. 1994) (same).

The plaintiffs' reliance on the "out with the old, in with the new" statement allegedly made by either Kline or Reardon is also misplaced. First, neither Kline nor Reardon was involved in the decisionmaking process that resulted in the plaintiffs' terminations (and served as the basis for their not being rehired). Kline was not a member of either selection panel and Reardon merely sat in on the selection panel meetings as a moderator of sorts. Thus, any statement

made by either of these individuals " 'that amount[s] to mere speculation as to the thoughts of the decisionmaker [is] irrelevant' to an inquiry of discrimination." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) (citation omitted); *see also Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir. 1997) (same). Second, even if Kline and Reardon could be characterized as decision-makers for purposes of the plaintiffs' ADEA claims, there is nothing inherently discriminatory about the colloquialism "out with the old, in with the new," and the plaintiffs offer no evidence upon which a reasonable jury could infer that this phrase was used by Kline or Reardon in a discriminatory manner. *Rogers*, 320 F.3d at 753.

Finally, the stray workplace remarks that the plaintiffs attribute to Shaner and Zdunich offer no support to their claims of age discrimination. Although Shaner and Zdunich both participated in the decisionmaking process that led to the plaintiffs' terminations,[6] they did so as members of selection panels—the actual decisionmakers in this case. *Shager v. Upjohn*, 913 F.2d 398, 405 (7th Cir. 1990) (noting that a committee can act as a decisionmaker in the employment discrimination context). Thus, the plaintiffs' evidence of Shaner or Zdunich's alleged animus toward older workers is relevant only if there is other evidence from which a reasonable jury could infer that their animus influenced the selection panels' deliberations to such a degree so as to result in the plaintiffs' terminations. *Shager*, 913 F.2d at 405. In sum, the plaintiffs were required to show a causal link between the prejudicial views allegedly expressed by Shaner and Zdunich and the plaintiffs' termi-

---

[6] Shaner and Zdunich were both on the six-member "Operators" selection panel, and Shaner was also on the five-member "Individual Contributors" selection panel.

nations—i.e., that "the committee's decision to fire [them] was tainted by . . . [this] prejudice." *Id.* The plaintiffs have presented no such evidence, however, and therefore they cannot rely on any statements made by Shaner and Zdunich to support their age discrimination claims. But even if the plaintiffs could make use of the stray remarks they attribute to Shaner and Zdunich (e.g., "How's the old man doing today?"), it would do them little good because these statements are clearly not sufficient to establish cases of age discrimination under the direct method of proof.[7] *Adams*, 324 F.3d at 939 (7th Cir. 2003) (noting that circumstantial evidence under the direct method "must point *directly to a discriminatory reason for the employer's action*") (emphasis added); *Cianci*, 152 F.3d at 727 (noting that " 'before seemingly stray workplace remarks will qualify as . . . evidence of discrimination [under the direct method of proof], the plaintiff must show that the remarks were related to the employment decision in question' ") (citation omitted).

The plaintiffs also argue, however, that they presented evidence sufficient to establish prima facie cases of age discrimination under the indirect method. As with most cases proceeding under the *McDonnell Douglas* framework, only

---

[7] We also note that many of the allegedly ageist remarks attributed to Shaner and Zdunich are so dated that they have no temporal proximity to the plaintiffs' terminations, and thus may not be used to support their age discrimination claims. *Markel v. Board of Regents*, 276 F.3d 906, 910 (7th Cir. 2002) (holding that statements made two months before termination were not contemporaneous, and therefore did not constitute circumstantial evidence under the direct method of proof); *Gleason v. Messirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997) (holding that statement made "as much as three months" before termination was not contemporaneous).

the second and fourth requirements of the test are at issue here—i.e., the "legitimate expectations" and "similarly situated" prongs. The plaintiffs contend that they were qualified to be retained or rehired by BASF and that similarly situated younger employees were treated more favorably by the company in the workplace restructuring or reorganization process. We disagree. It is undisputed that BASF established six or more developmental needs as the standard for being "unqualified" to remain with the company, and that each of the plaintiffs was terminated after the selection panels concluded that they possessed six or more developmental needs. The plaintiffs do not contest either of these facts, but instead maintain that they were qualified to be retained by BASF because: (1) the methodology used by the company to measure the competency of its employees was inherently flawed; (2) their prior positive performance reviews demonstrate that they were qualified to be retained; (3) many of them were found to be competent in areas by DDI, but had their scores lowered by the selection panels; and (4) there is no appreciable difference between the job duties of employees in the restructured organization and those performed by employees under the former regime. Almost all of these arguments, however, are merely an attempt by the plaintiffs to characterize the assessment process utilized by BASF in restructuring its NPR Unit as a pretext for age discrimination. But a plaintiff is not entitled to call into question the veracity or motives of his employer unless he first demonstrates that he was meeting the employer's legitimate workplace expectations. *Peele*, 288 F.3d at 328 (noting that "[i]f a plaintiff fails to demonstrate that she was meeting her employer's legitimate expectations, the employer may not be 'put to the burden of stating the reasons for [her] termination' ") (citation omitted); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) (same). "A plaintiff does not reach the pretext stage [of *McDonnell Douglas*], however, unless she first establishes a

*prima facie* case of discrimination." *Peele*, 288 F.3d at 326. To the extent the plaintiffs' contentions could possibly be interpreted as arguments that they were qualified to be retained or rehired by BASF, or that the company applied its legitimate employment expectations in a discriminatory manner,[8] we will address them.

At the outset, we note that one of the primary purposes of the restructuring process implemented by BASF was to determine whether its current employees possessed the skills necessary to perform *prospectively* in a manner consistent with the company's newly devised, increased workplace expectations. That BASF chose to make such determinations by utilizing a process that did not take into account the plaintiffs' prior written performance evaluations is of no import. *Scott v. Parkview Memorial Hosp.*, 175 F.3d 523, 525 (7th Cir. 1999) (emphasizing that employers are not required "to prefer paper-heavy evaluations over contextual assessments by knowledgeable reviewers, *or to exalt an assessment of past conduct over a prediction of future performance*") (emphasis added). Indeed, whether the plaintiffs or this court believe that BASF's prescribed methodology for gauging the prospective abilities of its employees was fair, prudent, or wise is beside the point. Employers, not employees or courts, are entitled to define the core qualifications for a position, so long as the criteria utilized by the company are of a nondiscriminatory nature. *Leisen v. City of Shelbyville*,

---

[8] We have held that "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated . . . younger employees in a more favorable manner), the second and fourth prongs merge—allowing the plaintiff to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele*, 288 F.3d at 329.

153 F.3d 805, 808 (7th Cir. 1998). And there is certainly nothing inherently discriminatory about an employer's decision to use criteria other than past performance evaluations to determine whether its employees can meet the increased workplace expectations that often coincide with a corporate reorganization. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 765 (7th Cir. 2001) (noting that "[w]hat the qualifications for a position are, even if those qualifications change, is a business decision, one courts should not interfere with"). Indeed, we have repeatedly held that " 'prior job performance evaluations, standing alone, [do not] create a genuine issue of triable fact when . . . *there have been substantial alterations in the employee's responsibilities . . . in the intervening period.' " Peele*, 288 F.3d at 329 (citation omitted) (emphasis in original); *see also Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998); *Grohs v. Gold Bond Bldg. Products*, 859 F.2d 1283, 1287 (7th Cir. 1988). Nor is there anything discriminatory about BASF's decision to allow selection panels comprised of management and supervisors to make the final decision as to whether its employees were competent in a given category (rather than leaving that to consultant DDI).[9]

---

[9]  Plaintiffs Allen, Cerutti, Clinton, Davis, and Real also claim that they satisfy the "legitimate expectations" prong of *McDonnell Douglas* because the DDI assessors concluded that they had no developmental needs. The DDI assessment, however, was but one component of the restructuring process implemented by BASF, and the DDI evaluators were only asked by the company to evaluate some of the 14 competencies at issue. More importantly, the selection panels, and not DDI, were charged with making the ultimate determination of whether an employee possessed the necessary skills and attitude to work in the restructured organization. Therefore, the initial scores given to employees by DDI have

(continued...)

The plaintiffs also imply that BASF applied its legitimate workplace expectations in a disparate manner because the company fired the plaintiffs yet retained two individuals with six or more developmental needs—Andrew Partilla and Helynne Smith. What plaintiffs' counsel neglects to mention, however, is that both Partilla (51) and Smith (42) are not outside the protected class. Furthermore, it does not appear that Partilla or Smith are substantially younger than any of the plaintiffs (as plaintiffs make no such argument). It is also worth noting that BASF terminated every employee under the age of 40 with six or more developmental needs.

Moreover, because BASF did not rely on prior performance evaluations in the restructuring process to ascertain whether its current employees were qualified to be retained, the plaintiffs may not use those evaluations as a basis for arguing that the company applied its legitimate workplace expectations in a discriminatory manner (by comparing their evaluations with those of younger employees who were retained). Finally, the plaintiffs were not qualified to be rehired by the company for the same reason that they were not retained—they lacked the necessary competencies.[10]

---

[9] (...continued)
no bearing on the question of whether the plaintiffs were qualified to be retained in the absence of any evidence that the selection panels lowered their scores for discriminatory reasons. This is evidence the plaintiffs do not have, and therefore the only scores that matter were those assigned to the plaintiffs by the selection panels.

[10] Plaintiffs do not identify anyone under the age of 40 or substantially younger who was terminated for having six or more developmental needs and was then subsequently reemployed.

For all of the preceding reasons, we conclude that the plaintiffs have not demonstrated that they were qualified to be retained or rehired by BASF, and thus they cannot make out prima facie cases of age discrimination under the indirect method. *Peele*, 288 F.3d at 328; *Coco*, 128 F.3d at 1179. We, therefore, need not address the plaintiffs' remaining arguments as to whether substantially younger employees were treated more favorably by BASF, or engage in any type of pretext inquiry. *Coco*, 128 F.3d at 1179-80.[11]

## B. Race and National Origin Claims

Plaintiffs Pearl Adams, Daniel Allen, Michael Severado (all of whom are black), and Steve Real (who is Hispanic) also contend that the district court erred in granting the defendants summary judgment for their race and national origin discrimination claims under Title VII and § 1981. In support of these claims, these plaintiffs assert that they worked in an environment replete with racist comments and where minority workers were treated as second-class citizens. Several of the racist comments referenced by the plaintiffs, however, are either extremely dated or were made by individuals who had no involvement or influence over the decisionmaking process that led to their terminations. Therefore, these comments cannot be used by the plaintiffs to support claims of race or national origin discrimination

---

[11] Plaintiffs also attempt to support their age discrimination claims using a disparate impact theory, but we have held that such claims are not permissible under the ADEA. *Miller v. City of Indianapolis*, 281 F.3d 648, 651 (7th Cir. 2002)

under the direct method.[12] *Swanson v. Leggett & Platt, Inc.,* 154 F.3d 730, 733 (7th Cir. 1998) (noting that "[o]nly evidence on the attitudes of the employees involved in the decision to fire the plaintiffs is relevant"). The only "racist" acts attributed to anyone involved in the decisionmaking process concern Thad Zdunich (a member of the Operators selection panel) and Kevin Biehle (a member of both selection panels). According to the plaintiffs, Zdunich "made hundreds of racial statements to Plaintiff Daniel Allen between 1998 and 2000," such as "it's got to be a black thing"; "for brothers only"; "brothers' meeting today?"; and "what you mean, brothers' meeting?" As for Biehle, the plaintiffs claim that he "treated [Steve] Real with less cordiality than he treated Caucasian workers," told Pearl Adams "the reason you're here is because you don't fit into our new family and you have been deselected," and informed Lori Washington, the other black Individual Contributor at the Joliet facility Job Family, "that a white employee would be taking over her duties on the same day that he [told Adams that she had been deselected]."

However, as we have already explained, the selection panels are the relevant decisionmakers in this case, and therefore Zdunich and Biehle's alleged animus toward blacks and Hispanics is, without more, not enough to establish the convincing mosaic of circumstantial evidence needed for the plaintiffs to prevail under the direct method of proof. To do so, the plaintiffs needed to present evidence

---

[12] For example, plaintiff Pearl Adams alleges that a co-worker told her to "get her black ass in the corner where you belong," that sometime back in the "1990s" she was called a "coon" by a supervisor, and that on another occasion a contractor not employed by BASF used the term "nigger-rigged" in her presence.

from which a reasonable jury could infer that Zdunich and Biehle's prejudicial views influenced their fellow panel members to such a degree that it resulted in their being terminated.[13] *Swanson*, 154 F.3d at 733; *Shager*, 913 F.2d at 405. This is evidence the plaintiffs simply do not have.

Moreover, as with the age discrimination claims, it is clear the incidents referenced by the plaintiffs in support of their racial or national origin discrimination claims would not permit a reasonable juror to infer racial or national origin discrimination under the direct method of proof. *See Adams*, 324 F.3d at 939; *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002); *Pafford v. Herman*, 148 F.3d 658, 666 (7th Cir. 1998). The plaintiffs also cannot prevail on their race and national origin claims under the indirect method because, as with their age discrimination claims, the evidence shows that they were not qualified to be retained or rehired by BASF, and that the company did not apply its qualifications in a disparate manner.[14]

---

[13] In this respect, the plaintiffs' arguments regarding Richard Harris, a black supervisor who they claim "occupies a position on the organization chart where no one reports to him," and Lori Washington, a black Individual Contributor who allegedly had her duties reduced as part of the restructuring process, are likewise insufficient to establish claims of race or national origin discrimination under the direct method.

[14] Here, the only evidence these plaintiffs offer to support their allegation that BASF applied its expectations/qualifications in a discriminatory manner is that the company retained one white operator, Andrew Partilla, who was found by the selection panel to have six developmental needs. This is true, but as the defendants point out, Adams, Allen, Real, and Severado all had more than six developmental needs. Moreover, the Operators Selection panel changed a number of DDI's assessment scores to improve

(continued...)

Finally, the remaining arguments offered by the plaintiffs in support of their race and national origin discrimination claims appear to be premised on a disparate impact theory. A disparate impact claim exists "when an employer has adopted a particular employment practice that, although neutral on its face, disproportionally and negatively impacts members of one of Title VII's protected classes." *Bennett v. Roberts*, 295 F.3d 687, 698 (7th Cir. 2002). To establish a prima facie case of disparate impact, a plaintiff must isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities. *Id.* Although the plaintiffs imply that BASF's restructuring process had such an effect, the numbers tell otherwise. Black employees in the company's NCR Unit were not disproportionally and negatively impacted by the restructuring process, and at the Joliet facility every Hispanic but Real was retained. Indeed, even the plaintiffs' own statistical expert witness conceded that the company's terminations did not have a statistically significant disparate impact on *any* protected group.

## C. Defendants' Cross-Appeal for Sanctions

In their cross-appeal, the defendants argue that the district court abused its discretion when it denied their motion for sanctions against the plaintiffs' counsel. Our review of the

---

[14] (...continued)
the ratings of several black employees and lower those of white employees. Therefore, it would seem that if BASF applied its qualifications in a disparate manner, it did so in favor of employees inside rather than outside the protected classes in question. Finally, there is no evidence that any white employee terminated by BASF for having six or more developmental needs was subsequently rehired by the company.

district court's denial of the defendants' motion for sanctions is deferential, and we will disturb the denial only if we conclude the court abused its discretion. *Smith v. Chicago Sch. Reform Bd. of Trustees*, 165 F.3d 1142, 1144 (7th Cir. 1999).

In denying the defendants' motion, the district court reasoned that plaintiffs' counsel had already been sanctioned when the court precluded her from deposing two witnesses, and noted that "[while the [plaintiffs'] other motions to strike may be meritless, they do not warrant sanctions under 28 U.S.C. § 1927." The defendants contend, however, that the plaintiffs' attorney should have been sanctioned by the court for "unreasonably and vexatiously multiplying the proceedings by filing two utterly frivolous motions to strike." Although we find many of plaintiffs' counsel's actions in this case to be less than professional, the defendants have not presented us with sufficient evidence from which we can conclude that the district court abused its discretion in declining to impose sanctions on her, and we therefore decline to disturb its ruling.

### III.

For the reasons noted herein, we AFFIRM the district court's judgment in all respects.

A true Copy:

      Teste:

                    _____

                    *Clerk of the United States Court of Appeals for the Seventh Circuit*