Jody A. LEE, Plaintiff,

v.

**CURT MANUFACTURING, INC., Defendant.**

No. 03–C–523–C.

United States District Court,
W.D. Wisconsin.

June 24, 2004.

Eric J. Haag, for Plaintiff.

Thomas R. Rusboldt, Weld, Riley, Prenn & Ricci, S.C., Eau Claire, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. Plaintiff Jody A. Lee contends that defendant CURT Manufacturing discriminated against her because of her sex when it terminated her employment and refused to hire her as the senior buyer for the company. Jurisdiction is present. 28 U.S.C. § 1331.

Presently before the court is defendant's motion for summary judgment. I conclude that plaintiff has submitted enough evidence to allow a reasonable jury to infer that her gender played a part in defendant's decision to terminate her and not hire her for the senior buyer position. This includes evidence of an anti-female attitude expressed by plaintiff's supervisor, the supervisor's decision making role in the termination and senior buyer hiring process, defendant's failure to terminate a male employee despite plaintiff's supervisor's displeasure with that employee's job performance and defendant's contradictory reasons for not hiring plaintiff for the senior buyer position. Defendant fails to meet its burden of demonstrating that despite having a discriminatory reason for its decisions, it would have taken the same

action anyway. As a result, I will deny defendant's motion for summary judgment.

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed and material.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Jody A. Lee worked for defendant CURT Manufacturing, Inc. as its purchasing agent from July 1998 through December 2001. Plaintiff earned a two-year associate degree in materials management from the Chippewa Valley Technical College in 1996. She earned a bachelor of arts degree in business administration and a bachelor's degree in specialized administration from Lakeland College in December 2001. Plaintiff earned her bachelor's degrees in two years through classes she took over the internet.

Defendant is located in Eau Claire, Wisconsin, and is a manufacturer and distributor of car and truck towing equipment, including trailer hitches, hitch balls and hitch ball mounts. Curt Tambornino, president and co-owner of defendant, and Tammy Tambornino, wife of Curt Tambornino and vice-president and co-owner of defendant, founded CURT Manufacturing in 1994. Since 1995, defendant's annual sales have grown from $1,158,771 to over $21 million in 2003. The number of people employed by defendant has grown from 27 in 1997 to 165 in 2004. During the time plaintiff was employed by defendant, defendant grew so fast that the volume of plaintiff's work increased three to four times.

Gregory Hooks has been defendant's chief executive officer since August 2000. Judy King Gehler was Director of Human Resources from March 2001 until October 2001. Robert Sigurdson was Director of Finance during 2001. Martha Hartung served as defendant's accounting supervisor from March 2000 until May 2002. Defendant hired Michael Vruwink for the senior buyer position in January or February 2002.

### B. *Plaintiff's Employment Background*

Immediately before her employment with defendant, plaintiff worked for SFR Industries in Cadott, Wisconsin where she was responsible for purchasing, inventory control and safety coordination. At SFR Industries, plaintiff did not perform any inventory turnover analysis. The most significant contract she negotiated was with an adhesive tapes vendor. Her ending wage at SFR Industries was $10.00 an hour; her starting wage with defendant was $11.00 an hour. Her wage at termination was $16.42 an hour, equivalent to an annual income of $34,114.83.

While plaintiff worked for defendant, Curt Tambornino negotiated the price and purchases of raw steel and negotiated and maintained all of the relationships with overseas vendors; plaintiff did only the paperwork involved in those negotiations. However, on one occasion, plaintiff negotiated the purchase of some raw steel from Ratner Steel and received a good price, saving defendant $23,400. Plaintiff informed Curt Tambornino about her negotiations with Ratner Steel. Plaintiff was never involved in forecasting needs for raw steel. The biggest vendors plaintiff worked with were the hitch companies but Hooks (defendant's CEO) negotiated the prices on those contracts.

Plaintiff is employed by the state of Wisconsin as a purchasing agent for the Stanley Correctional Institution and the High View Correctional Institution. She began this position in April 2002. Her initial rate of pay was $15.36 an hour and has increased to a current rate of $17.92 an hour.

## C. *Sex Discrimination*

### 1. *Termination*

At least two dozen times Hooks told Human Resources Director Gehler that plaintiff was a "bitch." In addition, when referring to plaintiff, he would say things such as, "I hate that bitch" (at least six times); and "she [plaintiff] must be on Prozac." Hooks stated regularly to Gehler, and at least once in front of plaintiff, that he knew lots of men who saved their companies millions of dollars through purchasing efforts. Hooks compared plaintiff to those men.

Hooks made comments about women in general. On more than one occasion, Hooks made the comment that women should stay at home and take care of the kids. He stated that Tammy Tambornino should stay home and watch the kids. Hartung, defendant's accounting supervisor, witnessed Hooks criticize plaintiff frequently but never witnessed him treat male employees in the same manner. Curt Tambornino emailed Hooks telling him that his voice carried in the office, that the words he used were not always pleasant and that CURT Manufacturing, Inc. could be held liable for misinterpretation and harassment.

During an August 2001 meeting that involved Hooks, Director of Finance Sigurdson, Curt and Tammy Tambornino, Shipping and Receiving Manager Randy Reider, Gehler and plaintiff, plaintiff provided documentation and information on the problems between shipping and receiving and purchasing. During the meeting, Hooks sat next to Curt Tambornino. After the meeting, Curt Tambornino told Gehler that Hooks had written "circle jerk" on his note pad for Curt to see. In addition, after the meeting Hooks told Gehler never to set up another meeting like that because it made plaintiff look good and Reider look bad. During meetings, Hooks would dismiss plaintiff's, Gehler's and Tammy Tambornino's comments out of hand, but not male employees' comments.

Hooks wanted to fire plaintiff in July 2001 and instructed Gehler to draft the termination letter. Gehler discussed Hooks's proposed termination of plaintiff with Tammy Tambornino. Tambornino agreed with Gehler that plaintiff was doing her job and should not be fired. Hooks was out of the office during the time that Gehler spoke to Tammy Tambornino about plaintiff's termination. When Hooks returned, he was upset that plaintiff had not been terminated. As of October 2001, no one in management had expressed any concerns to Gehler about plaintiff's performance.

Sigurdson told plaintiff that he was becoming her supervisor because Hooks could not deal with her objectively.

A document entitled, "Executive Management Team's Position Based on Projects and Considerations" was signed by Nancy Ayres, Robert Sigurdson, Judy King Gehler, Tammy Tambornino, Curt Tambornino and Greg Hooks. Section 2 of this document discusses "Corporate Restructuring" and says that Mike M. would be let go at the end of August or sooner, that Randy would be let go after a decision had been made regarding the employment of Calloway, that Scott M. would be let go after the first of the year and that plaintiff would be let go after her probationary period.

In addition, the document says that a decision on severance would have to be made for Mike M., Randy and Scott M. but does not indicate that a decision on severance would have to be made for plaintiff. Both Mike Murphy and Randy Reider were provided severance pay without having to sign a release. Plaintiff was told that she could not receive a severance package unless she signed a separation

agreement that would have precluded her from bringing a claim against defendant.

On the day defendant terminated plaintiff, Sigurdson told Hartung that plaintiff was terminated because of Hooks's inability to get along with her. Sigurdson told plaintiff that defendant had decided to terminate her. When plaintiff asked Sigurdson why she was being terminated, he responded, "You know why." No one other than Hooks treated plaintiff in a sexist kind of way. No other management people were unfairly critical of her either to her face or behind her back. Plaintiff does not know of any other woman who was discriminated against at CURT Manufacturing, Inc. because of her sex. On May 7, 2002, defendant indicated that a reason for plaintiff's termination was that her performance was not meeting the company's expectations. Hooks believed that Scott Morrison, a male, was not doing his job adequately, but Morrison was not terminated.

2. *Senior buyer position*

As defendant grew in size, it became increasingly necessary to delegate purchasing responsibilities to a sophisticated and experienced buyer with experience in inventory analysis. Hooks and Curt Tambornino needed to focus more on company acquisitions.

In July and August 2001, Curt Tambornino met with other members of upper management including Tammy Tambornino, Hooks, Sigurdson and Gehler to discuss options with respect to fulfilling the purchasing function of the business. The advertisement for the position provided that the senior buyer would report directly to defendant's chief executive officer and that a bachelor's degree and five years experience at the buyer level was preferred.

Hooks and human resources staff decided which candidates to interview for the senior buyer position. Plaintiff applied for the position but was not offered an interview and was not hired for the position. Vruwink, a male, was hired for the position in January or February 2002. His income for the first 12 months of employment as a senior buyer for defendant was $57,115.37. Vruwink did not have experience negotiating steel contracts.

## OPINION

■ Plaintiff argues that defendant violated her rights under Title VII of the Civil Rights Act by terminating her and failing to hire her for the senior buyer position because of her gender. As I understand the facts, defendant eliminated plaintiff's purchasing agent position and replaced it with the senior buyer position. Had defendant hired plaintiff for the senior buyer position, she would have continued her employment with defendant. Therefore, for simplicity, I will treat defendant's decision to terminate plaintiff and not hire her for the senior buyer position as the same decision.

"Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir.2004). A plaintiff may prove employment discrimination under Title VII by demonstrating that "race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (citing 42 U.S.C. § 2000e–2(m)).

A plaintiff may rely on either direct or circumstantial evidence. *Id.* at 99, 123 S.Ct. 2148. Direct evidence essentially "requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Cerutti v. BASF Corporation,* 349 F.3d 1055, 1061 (7th Cir.2003). A plaintiff that lacks evidence of such an admission can construct a "convincing mosaic of circumstantial evidence that points directly to a discriminatory reason for the employer's action." *Davis v. Con–Way Transportation Central Express, Inc.,* 368 F.3d 776, 783 (7th Cir.2004). For example, evidence "that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of *circumstantial evidence* that is probative of intentional discrimination.'" *Desert Palace,* 539 U.S. at 100, 123 S.Ct. 2148 (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). A plaintiff may rely on decision makers' remarks or behavior that either acknowledges discriminatory intent or more ambiguously supports an inference of discrimination. *Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). In addition, a plaintiff may show that similarly situated employees were given more favorable treatment. *Id.* Finally, a plaintiff may show that she was qualified for the job but replaced by someone outside her protected class and that the employer's stated reasons are unworthy of belief. *Id.* Once a plaintiff demonstrates that sex, for example, was a motivating factor in an employment practice, the employer may limit its liability by demonstrating that it "would have taken the same action in the absence of the impermissible motivating factor." *Desert Palace,* 539 U.S. at 94–95, 123 S.Ct. 2148.

Defendant contends that plaintiff fails to make a case of sex discrimination because (1) Hooks was not solely responsible for the decision to terminate plaintiff and to not hire her for the senior buyer position and (2) plaintiff fails to link Hook's alleged anti-female remarks to defendant's termination decision. Dft.'s Br., dkt. # 10, at 4. As to defendant's contention that Hooks was not the sole decision maker, it is enough for Title VII purposes that he had some influence on the decision. *Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 762 (7th Cir.2001) (decision may be discriminatory when decision makers themselves, or those who provide input into decision, express such feelings (1) around the time of, and (2) in reference to adverse employment action complained of). It is undisputed that Hooks was part of the executive management team that decided to terminate plaintiff. In addition, he helped human resources staff with interview decisions for the senior buyer position. Furthermore, Hooks was defendant's chief executive officer and plaintiff reported to him for a time. A reasonable jury could infer that at the very least Hooks had input into the decision to terminate plaintiff and not to hire her for the senior buyer position.

However, I agree with defendant that plaintiff fails to link Hooks's alleged anti-female remarks to defendant's termination decision. It is undisputed that Hooks referred to plaintiff as a "bitch" to Gehler numerous times, that he thought women should stay home with their children, that he compared plaintiff's ability to save the company millions of dollars with the achievements of certain men and that he showed disrespect toward her and other women in meetings. These remarks and attitudes expressed by Hooks show that he had little respect for women in the workplace. *Volovsek,* 344 F.3d at 690 (comment like "keeping them barefoot and pregnant" clearly derogatory to working women and suggest that person making comment does not want women in workplace). However, there is no evidence

that these discriminatory remarks or actions were connected to the decision not to hire plaintiff for the senior buyer position. *Gorence,* 242 F.3d at 762 (to prove discrimination by themselves, inappropriate remarks must be related directly to the employment decision). The only remarks plaintiff submits as evidence in connection with her termination are Sigurdson's comments that plaintiff was terminated because of Hooks's inability to get along with her and Sigurdson's reply to plaintiff's question about why she was terminated by saying "You know why." By itself, this evidence is not enough to allow a jury to infer that defendant terminated plaintiff for discriminatory reasons.

Plaintiff tries to supplement Hooks's remarks with evidence of his disparate treatment of plaintiff and other male employees. For example, plaintiff points out that although defendant required her to sign a release in order to receive severance pay, defendant did not impose that requirement on Mike Murphy and Randy Reider. Although this is evidence of disparate treatment of similarly situated employees (i.e., those who were terminated), plaintiff's claim is not about receiving severance pay. Rather, her claim concerns the loss of her job, which is the same fate experienced by Murphy and Reider. Therefore, the comparison does not carry the day for plaintiff.

However, it is undisputed that despite Hooks's belief that Scott Morrison, a male, was not doing his job adequately, defendant did not terminate Morrison. (I note that it is undisputed that the executive management team's corporate restructure plan states that "Scott M. would be let go after the first of the year." The parties do not clarify whether "Scott M." is Scott Morrison.) It is unclear why Hooks wanted to fire plaintiff in July 2001. To the extent that Hooks wanted to fire plaintiff because of poor job performance, defendant's failure to fire Morrison for a similar reason could support an inference of discriminatory animus toward plaintiff.

Finally, it is undisputed that defendant hired Vruwink, a male, for the senior buyer position and that plaintiff held the requisite bachelor's degree for the position. However, it is disputed whether plaintiff's and Vruwink's qualifications for the senior buyer position were equal and whether defendant's reasons for hiring Vruwink and not hiring plaintiff are worthy of belief. For example, defendant argues that plaintiff was not qualified for the senior buyer position because she did not have a four-year degree or had any experience negotiating contracts with steel companies. However, it is undisputed that on one occasion, plaintiff negotiated the purchase of some raw steel from Ratner Steel and was able to save defendant $23,400. In addition, the advertisement for the senior position required a bachelor's degree, which plaintiff had acquired. It is difficult to understand defendant's distinction between a four-year degree and a bachelor's degree, particularly when the advertisement specified "bachelor's degree."

Furthermore, it is undisputed that as of October 2001, no one in management had expressed any concerns to Gehler about plaintiff's performance and that Gehler and Tambornino thwarted Hooks's effort to fire plaintiff in July 2001 because Tambornino thought that plaintiff was doing her job. Yet in May 2002, several months after Vruwink started working as defendant's senior buyer, defendant indicated that a reason for plaintiff's termination was her failure to meet the company's expectations. It is unclear whether defendant meant that plaintiff was not meeting its expectations as a purchasing agent or would not have met its expectations as a senior buyer. An employer is free to assess an employee's skills prospectively in "a manner consistent with the company's

newly devised, increased workplace expectations." *Cerutti*, 349 F.3d at 1064 ("[T]here is certainly nothing inherently discriminatory about an employer's decision to use criteria other than past performance evaluations to determine whether its employees can meet the increased workplace expectations that often coincide with a corporate reorganization."). However, defendant fails to articulate the reasons for terminating plaintiff and not hiring her for the senior buyer position. To the extent that defendant tries to articulate reasons for not hiring plaintiff for the senior buyer position, it contradicts itself by stating that plaintiff lacked qualifications she did in fact possess. When one combines Hooks's anti-female attitude and remarks, his decision making role in the termination and senior buyer hiring process, the fact that defendant did not terminate Scott Morrison despite Hooks's displeasure with Morrison's job performance and defendant's contradictory reasons for not hiring plaintiff for the senior buyer position, a reasonable jury could infer that defendant's decision to terminate plaintiff and not hire her as the senior buyer was motivated by plaintiff's gender. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002) (on motion for summary judgment, court must draw all reasonable inferences in favor of non-moving party).

 Because plaintiff meets her burden of creating an implication that sex discrimination played a part in defendant's decision to terminate her and not hire her for the senior buyer position, the burden shifts to defendant to show that it would have acted the same even in the absence of the discriminatory motive. *Desert Palace*, 539 U.S. at 94–95. Defendant fails to meet its burden. For example, as discussed already, it is unclear why defendant terminated plaintiff and failed to hire her for the senior buyer position. For defendant to demonstrate that it would have made the same decisions even in the absence of a discriminatory motive, the reasons for its decisions should leave no room for doubt. In addition, defendant fails to submit sufficient evidence showing why it chose Vruwink for the senior buyer position. Defendant states that Vruwink had skills at negotiating contracts and at inventory analysis and that plaintiff did not have these skills. Dft.'s PFOF, dkt. # 11, ¶ 25. Yet defendant fails to address why those skills were more important than the skills possessed by plaintiff. In fact, defendant submits very little information about Vruwink's qualifications as compared to plaintiff's. As a result, I cannot conclude as a matter of law that defendant's decision to terminate and not hire plaintiff for the senior buyer position was not motivated by discriminatory animus, at least in part, and that defendant would have taken the same action in the absence of the discriminatory reason. (I note that if plaintiff can prove that sex discrimination was a motivating factor in the decisions to fire plaintiff and not hire her as senior buyer, defendant can limit its liability but not obviate it altogether by showing that it would have made the same decisions anyway. *Desert Palace*, 539 U.S. at 94–95, 123 S.Ct. 2148.) Therefore, I must deny defendant's motion for summary judgment.

## ORDER

IT IS ORDERED that defendant CURT Manufacturing, Inc.'s motion for summary judgment is DENIED.